Good morning, Your Honors. My name is David Michael. I'm the attorney for Michael Kissinger, the third-party petitioner and appellant in this matter. After the convictions of Peter Dejanew and Tep Dejanew, the Court entered a preliminary order of forfeiture. And following that, my client filed a motion for modification of that preliminary order of forfeiture as provided in 21 U.S.C. 853N, seeking reimbursement for his fees and services to both of the defendants and seeking his reimbursement out of the proceeds from the sale of 690 Market Street and 1700 California Street. And by the way, the net proceeds from the sale of those properties was about $3.8 million from the sale of 690 Market Street and $2.5 million from the sale of 1700 California Street. But, counsel, weren't these matters handled before the Bankruptcy Court? Well, as to the District Court denied my client's petition as to 690 Market Street and as to 1700 California Street. And if you're asking me the question regarding 690 Market Street, didn't the – did not the District Court rely on the bankruptcy action and the issue regarding preclusion that we have here? In regards to my client's claim against Tep Dejanu, which is a 690 Market Street property, the Court decided that the issue was precluded because Judge Molinari in the Bankruptcy Court had already litigated those issues, those claims. And isn't it required that all claims should be brought before the Bankruptcy Court? They should have been brought? Well, the bankruptcy petition was only a bankruptcy as to a Huat Hong Associates. It wasn't the bankruptcy of Tep Dejanu, nor was it the bankruptcy of Peter Dejanu. So no claims needed to be brought regarding those two people. With respect to – excuse me. With respect to Market Street and Tep Dejanu. Let's deal with that one first. I'd like to focus on that for a moment. With respect to Market Street and Tep Dejanu, I think the argument I would make on that is that did the Bankruptcy Court really have jurisdiction to determine the claim of my client against Tep Dejanu in the bankruptcy proceeding when Tep Dejanu was not a party to the bankruptcy proceeding? Well, why does that matter? I mean, it was – excuse me. I mean, just a second. Isn't there an issue of preclusion here? I mean, the briefs for some reason keep talking about claim preclusion, as I understand it. But for issue of preclusion purposes, it doesn't matter who the opposing party was. It matters that in a proceeding in which it mattered, there was an adjudication in which your client participated and had a chance to make his arguments and did. And in a way, I agree with that, Your Honor. I suppose that the one issue is did the court really have the jurisdictional power to make a determination regarding my client's claim against Tep Dejanu in that bankruptcy proceedings? And I'll submit that to the Court for its determination. Even if the district court was correct in saying that there was an issue of preclusion regarding certain claims that were litigated in the bankruptcy proceeding, two of Mr. Kissinger's claims were not litigated in that bankruptcy proceeding. That seems right to me. So I submit to the Court that those two claims are still viable claims that the Court didn't make a ruling on, and that was that case. Because in that instance, since the bankruptcy was only the bankruptcy of the corporation and there was no obligation to present the other claims against Tep is basically your argument. No. He was not obligated. And I don't think anybody's ever made the argument that he was obligated to pursue those claims. He didn't feel he was obligated to pursue any of those claims, actually, because they were against Tep Dejanu. But he did. Somehow in the bankruptcy proceedings, in fact, there was some litigation of all of eight of the claims, and our argument, my argument to you now is that at least two other claims were not litigated in that bankruptcy proceeding. One of those two was the Yee claim? One was the Yee v. Dejanu claim. That's in ER 145, 146, the excerpt of record. The other is Prasit Teng Frong Shek Tai v. Dejanu, and that's at the same location, ER 146. When did the Yee litigation start? I don't know when the Yee litigation started. From the record, it appears that the attorney-client fee agreement was in or about August or September of 1995 with respect to the Yee litigation. Is that right? Could be, Your Honor. There is a – I notice that there is a promissory note signed August 26th or 29th of 1995 purporting to subsume all of TEP's obligations into one promissory note giving your client an interest in the partnership as well as Market Street. In regards to TEP Dejanu? Yes. I suppose you could interpret it that way, Your Honor. But if that's the case, then should that claim aid? He should have litigated those claims in the bankruptcy proceeding, if that's true? Well, assuming I'm right, maybe I'm not, but there's a promissory note in August of 1995. It appears to wrap together all the existing legal responsibilities of TEP into this promissory note, and in that promissory note, TEP gives or conveys to your client an interest in Market Street as well as in the partnership, the Hung – in the particular partnership, Hung Wong, thank you, partnership. And if that's the case, should not that claim have been brought in bankruptcy court along with the others? Well, there's been no representation that any of the claims should have been brought into the bankruptcy court regarding my client's claim against TEP Dejanu. I don't know that that's true, even if it does identify Hung Kwan Associates in that consolidation document that you referred to. I think that the Hung Kwan Associates and TEP Dejanu are two separate entities. But I would submit that to the Court, and I don't want to dwell on that, because I do want to get to 1700 California Street. I respect the Court's concern regarding that issue. I would submit that those two claims were not litigated in the bankruptcy petition. They were not required to be litigated in the bankruptcy petition, nor were all the claims that did remain that weren't litigated, and I submit to the Court that those claims are something that should have been recognized in the ancillary proceeding after the criminal conviction of TEP Dejanu. Going to 1700 California Street, the Court made a determination that seemed to imply that Kissinger had some reason to believe that 1700 property was subject to forfeiture because of what happened four days after the purchase of the property. The Court's reasoning, I submit to the Court, really makes no sense, and I can't imagine how it would cause the Court to believe that. And here's the reason why. The property was bought in a nominee name. Prasert Teng Trongsekthai formed SEO Corporation. The bank, Bangkok Metropolitan Bank, knew about that. When he bought the property, he bought it in his name, in SEO Corporation name. The bank was part of forming of SEO Corporation, and after the purchase of the property by Trongsekthai, four days later, Kissinger was involved in the transfer of 90 percent of the interest in SEO Corporation to Peter Dejanu. Now, the Court said that should have raised some suspicion on Kissinger's part, because all of a sudden, Trongsekthai is transferring 90 percent interest in SEO to Peter Dejanu. But there's no reason for the Court to have come to that conclusion. In fact, when the Court discussed the other attorney, Mr. Hughes's issue, the Court concluded, made certain findings, and the Court's findings were that since Peter Dejanu was not convicted of using a straw buyer for 1700 California Street, the government abandoned that theory, so that can't be used as a basis for raising any suspicion. Bangkok Metropolitan Bank, BNB, was completely aware that Peter Dejanu was involved in the purchase of 1700 California Street as an undisclosed principal. That's the finding by Judge Alsop. BNB approved of it. BNB helped create SEO and took the shares of SEO as a security for the loan, and BNB over 12 years made loans to nominees presented by Dejanu for Dejanu's investments. Furthermore, it was reasonable to believe that BNB thought that Dejanu was a true owner of 1700 California Street. Once again, that's what Judge Alsop decided. So if all that is true as to Hughes, it has to be true as to Mr. Kissinger. There was no other way. Isn't there one distinct difference here? Isn't your client the CFO, secretary and treasurer of SEO? At the August 18th meeting, in fact, he became that, yes, four days later after the ---- Relevant question is, is there any, as I understand it, is there any basis and did the district court find any basis why your client would have known about the fraudulent or the misrepresented application, loan application? That's basically what you're talking about, right? Absolutely not. There's nothing in that activity on August 18th and August 19th that would cause anybody to consider that Praster, Teign-Frank Shackdye made some false misrepresentation in the original loan application. As a matter of fact, the court ---- Anything in the record to show that he ever saw it, that he ever knew about it, that he had anything to do with that loan application? Nothing. Nothing. The court made the same finding regarding Mr. Hughes. It says nothing in the record. This is Judge Alsop. Nothing in the record to show that William Hughes knew or had reason to know that Peter Desgenieux had earlier submitted the loan application with misrepresentations about Teign-Frank Shackdye. There's nothing in the record to show that Mr. Kissinger knew anything about it. He didn't know anything about it. He was not part of the loan application. He never was. He got involved on August 18th in that. But he was never part of the loan application by Teign-Frank Shackdye. So I think the court was really wrong in trying to conclude, just based on those one act, those activities, that Mr. Kissinger should have been put on notice, should have had some suspicion, should have had some reasonable belief that the property was subject to forfeiture. It's just too great of a stretch. And so the Court's reasoning as to Hughes, I cannot find any reason why it doesn't equally apply to Mr. Kissinger. And I realize that I lost all my time for rebuttal. No, that's okay. We'll give you about a minute. Pardon me, Your Honor? We'll give you a minute or so. Thank you very much. I appreciate that. Kassel. Could you start with the second point in terms of why that isn't correct? I have a hard time understanding why that isn't right. Absolutely, Your Honor. May it please the Court, I'm Assistant United States Attorney Stephanie Hines, and I'll be directly addressing Mr. Kissinger's appeal. With respect to the 1700 California property, let me first start out with this premise. In a criminal forfeiture ancillary proceeding, the burden of proof is on the appellant, is on the Petitioner, to establish his claim by preponderance of the evidence that he's entitled to some interest in forfeited property. So the burden rests entirely with Mr. Kissinger. In respect to the 1700 California property, the Court focused on what it – on the second part of the statute, the idea about there being – that Mr. Kissinger reasonably should have known that the property was subject to forfeiture. The Court considered that to be a threshold inquiry before it went on to the other aspect of the statute. The Court looked to the timing and the magnitude of – the timing of the transactions related to the transfer of stock with respect to the SEO, the purchase of the building with the fraudulent loan application, Mr. Kissinger's role in that. Mr. Kissinger's role was the loan application submitted August 14th. August 18th, there's a meeting held. Mr. Desjardins is present. Mr. Tengkron-Sakthi is present. Mr. Kissinger is present. He is appointed the CFO. He is the Secretary. He is the Treasurer. There's a transfer of stock, 90 percent of the stock, from Prosser to Mr. Desjardins. There is a document in the record, and during the course of Mr. Kissinger's deposition, he was deposed in connection with the ancillary proceeding here. He discusses or identifies that there was supposed to be a meeting held regarding the creation or incorporation of SEO on 813, the day before the loan application was submitted. The Court was aware of that. That was part of the record here that the Court considered. So 813, there was supposed to be an incorporation meeting. For some reason, it never happened. 814, the loan application is submitted with the false information. Eight, eight – Kagan, who submitted it, not the corporation? Mr. Desjardins submitted it to Acquire 1700 California. 818, this incorporation meeting is held, the transfer of stock. 818 – 819, the following day, another meeting is held in where Mr. Desjardins becomes the – acquires the power of attorney for SEO, and he is in charge of all aspects, all decision-making aspects regarding 1700 California and SEO. His son, Tep Desjanu, is made the vice president. Kagan, as you know – But you're still looking for some connection to this loan application. Well, let me say this. Mr. – Mr. Michael states that the record is devoid of any evidence. He claims that Mr. Kissinger was aware of this loan application. I'll say the onus is on Mr. Kissinger to put in the record that he actually had no knowledge of the fraudulent activity that was going on, and the record is devoid of that. He bears the burden of that in the context of this case. So your – the problem, as you understand it, is that he didn't stand up and he didn't say in his deposition, I didn't know anything about the loan application. That's correct. That's correct. And had we been in a different situation. That is in part correct. In the context – the other difference, and I think Judge Houston touched on this as well, is that with respect to Mr. Hughes, one of the other attorneys who filed a petition in this case, and Mr. Kissinger, it was night and day in terms of the timing of when they became involved in the 1700 case. And Mr. Hughes didn't stand up and say, I didn't know anything about the loan application? He certainly did. He certainly did. Mr. Hughes came in much later. Much later in the case, years later. Years later, is that right? Mr. Kissinger was the only attorney. No, I understand that, but I want to know what the record shows about what Mr. Hughes put on the record in terms of what he – whether he knew or didn't know about the loan application. Mr. Hughes was unaware of the loan application. The only – the only time he – So it's on the record that Mr. Hughes said in this – in this proceeding that he was unaware of the loan application. I believe so, Your Honor. He was deposed in connection with this case, and I believe during the course of his deposition he did state that he was unaware of that. The first time he became aware, I believe, of a loan application is during the course of the litigation in which he represented Mr. Kissinger. Mr. Kissinger was never asked that and never answered it. I believe that he was, and I believe that's what the record will state, Your Honor, that – and in fact, it was – it's his burden to come forward with that. And again, the Court sat through not only the ancillary proceeding, but it considered everything with respect to the trial, all the evidence. Mr. Kissinger actually did say that. But I don't see that anything else is relevant. I mean, it really does not seem to me that anything that you said before is relevant, because it demonstrates that he might have known about it, but it doesn't demonstrate that he did. But your burden point may be right. The question is, what does the record show about whether he knew or didn't know? Well, let's focus on the standard for a second. The standard is that he reasonably should have known or could have known that the property was subject to forfeiture. What Judge Alsop, in fact, did was impose a duty of inquiry with respect to Mr. Kissinger, that he should have known it was highly suspicious, all these transactions occurring so close in time to when the false application was submitted. He was – he had been representing Mr. Desjardins prior in other proceedings. He was an attorney for Mr. Desjardins. Coincidentally, he did say, by the way, in his deposition, that despite the fact that we're here arguing about whether or not he's entitled to fees for work that he did in various projects related to both 690 and 1700 California, he did claim that his only function at those two meetings was a scribe. He didn't ask any questions about why this was happening. He didn't seek any fees with respect to it. The Court found that incredible, to be honest. And the Court said, given all of this – Well, the whole thing – it's totally incredible to think that he didn't know that these people were straw buyers and that – and all that. But for reasons that, you know, are not obvious on the record, that isn't what was charged. What was charged was a – misrepresentations with regard to the application, which in some ways, you know, don't have much to do with the rest of what happened. I mean, he could have filed a perfectly good loan application, and it would have been just as – as he sort of corrupted a deal anyway, when just as – as troublesome. But that isn't how this case has been developed. Well, I will say this. I don't believe the standard is, or I don't believe the law requires that he knows a specific fact, so to speak, with respect to why the property was subject to forfeiture. For instance, my example would be, I think the straw buyer – the straw buyer incident is sufficient. But that's not what Judge Alsop thought, because he found otherwise with respect to Mr. Hughes. He did. He did find otherwise with respect to Mr. Hughes, and I think it has to do with the timing of when Mr. Hughes came into this matter versus the timing – so close in time to when the – Pardon. The legal question, which is a legal question, i.e., does the forfeit – does he have to have reasonable belief – or reason to believe there was going to be a forfeiture on the ground on which there was a forfeiture or not on some other ground? Judge Alsop had a definite view about that. Are you disputing that view? I believe that he need not have to find the particular ground that the government charged in the case. If there was another basis for which he believed the property was forfeitable, I believe that is sufficient under the statute. For instance, the – I'll give the example in the context of a drug case. I've done a lot more drug cases than I have fraud cases. If, in fact, Mr. Kissinger was an attorney representing a drug defendant, and the property subject to forfeiture was a residence, and the residence was used to conduct a drug activity, a marijuana grow operation or something like that, and also it was purchased with, in fact, drug proceeds from a prior operation, if the government charged in its criminal case that the property should be forfeited on a proceeds theory, if Mr. Kissinger was aware that the property was used to facilitate the drug transaction, I don't believe he can come in here and claim he was reasonably aware that the property was subject to forfeiture. Kagan. There's no briefing in this case, really, on this legal issue. You seem to be assuming in your brief, Judge Alsop's standard. Well, I will say this. There are two cases that I have found that support the standard that Judge Alsop imposed with respect to Mr. Kissinger regarding the duty to inquire. One is U.S. v. Frick Home. It's a Seventh Circuit case from 2004. The site is 362 F. 3rd, 413. In this case, the Court basically said that the Petitioner can't be willfully blind to facts that would have supported that the property was subject to forfeiture. In that particular case, it had to do with a fraud scheme, an investment fraud scheme where the defendant was defrauded investors of the tune of $15 million. One of the investors went to the defendant and said, hey, look, if you don't, you know, give me title of this property, repay this loan, I'm going to call the authorities on you and I'm going to complain. Well, what the defendant did is put claimant's interest into property, which property was subject to forfeiture in the context of the criminal case. The Court held that in that particular case, the company, the victim company should have, who himself was a victim of the fraud, should have been more aware and couldn't be willfully blind to the facts that the property for which the he had acquired title to would have not put him on notice that that property was subject to forfeiture. There are two other cases. I'll give you the sites. One is a case out of the Eastern District of Virginia, In re Moffitt Zwierling. It's 846 F. Supp. 463. That's dealing with drug proceeds. And the other one is U.S. v. Medina-Cortez. It's a Southern District of Florida case from 2001, 155 F. Supp. 2nd, 1338. Again, both of those dealing with the duty of inquiry that the party has. My time is up. And if the Court would like me to respond. Kagan. Kagan. You're free to address the res judicata, collateral estoppel process. Certainly. The Court is absolutely correct, and on point with respect to this. This is a issue or claim preclusion. No, it's an issue of ‑‑ I think it's an issue of issue of preclusion. Each of these claims were litigated, and the two that he claims were ‑‑ Well, eight of them were. What about the other two? The two that he claims were not, as Judge Houston rightly pointed out, they should have been brought for a couple of different reasons. One, the ‑‑ one of the claims relates to the litigation of Tendersaki v. Tepdejenu. The basis of that contract, or the attorney fee contract related to that case, cites the client as Tepdejenu individually and Hongwan Associates. I see. So his claim that he should not have brought that against in the bankruptcy proceeding is just totally without merit. It's right there on his face. It should have been brought. With respect to the Yee v. Tepdejenu, again, Judge Houston is absolutely correct. It's based on this promissory note, a promissory note in which was involved in part of the bankruptcy proceeding where the court, Judge Mentale, litigated that, and it should have absolutely been brought there. So he is ‑‑ the district court here was absolutely correct in adopting those findings from Judge Mentale's order and denying his claim as to both 619 Market and 1700 California. Thank you very much. Thank you, Your Honor. Ms. Flaherty. Sir. I'd like to try to be much more clear about this ‑‑ What about the burden of proof question? About the what? Burden of proof question. Did your client ever ‑‑ is there anything on the record where your client said that he did not know about this loan application? There's nothing on the record about the loan application whatsoever in relationship with my client. The issue never came up. It never came up. He was deposed by the government. The government never asked him that question. But there's no evidence whatsoever that he knew about the loan application. So I think the government is completely ‑‑ Well, but if the burden is on him, why doesn't he lose? Pardon? If the burden is on him, why doesn't he lose? The burden is on him to show that. The statute says that the burden is on him to establish his claim, which he has done, and the court even assumed that he had established his claim. It can't be a burden on him to establish a negative because it doesn't make any sense. Why? There was no evidence whatsoever that he had any knowledge or had any reasonable belief that the property was subject to forfeiture, nothing. It's only in Judge Yeltsin's final order that the thing even came up. But if he ‑‑ he does not deny that he knew it, for all we know, he did know it. So how can he prove that he reasonably didn't have reason to suspect the forfeiture when the forfeiture was around the application and he has not given any evidence that he didn't know about the application? But all the evidence in this case, and there's extensive evidence in this case, shows that he had nothing at all to do with the loan application. Well, that doesn't mean that he didn't know about it. He could have known about it. The loan application was a loan application prepared by Teng Trong Saktai with Peter Dejanew that was submitted to the Bangkok Metropolitan Bank. I understand that. Mr. Kissinger wasn't even involved in that. Excuse me. Just a minute, sir. He was around the time period. He was involved with this transaction around the same time period that the application was submitted. And he ‑‑ for all we know, there are two possibilities. He saw the loan application before or after it was submitted or he didn't. If he did, he may have had reasonable reason to believe that there was forfeiture. If he didn't, then he wouldn't have. We don't know which is which. When you don't know which is which, doesn't the person with the Bernda proof lose? No, Your Honor. I don't think so at all. You know, I think that there has to be some evidence for him to refute as far as whether or not he had some reasonable basis to believe that the property was subject to forfeiture. The loan application was a private document between Teng Trong Saktai and Bangkok Metropolitan Bank. There was no evidence that Mr. Kissinger even ever saw the document. As a matter of fact, the evidence is that he never did. Where is that? You know? Well, in all the testimony of all the individuals regarding the loan application, Mr. Kissinger was never there when that loan application was prepared. He was never there when it was presented to Bangkok Metropolitan Bank. He was never there when Bangkok Metropolitan Bank considered the loan application. And he was never there when Mr. Dejanoo assisted Teng Trong Saktai in preparing the loan application. And when Mr. Dejanoo talked to Teng Trong Saktai about the contents of that loan application, he was never there. And there's tons of evidence about those events taking place. There's all kinds of evidence. This is like a blowout of left field by Judge Alsop, who first raised it in his order denying the petition. Nobody ever saw it as an issue until Judge Alsop made this determination. But I think that what you can do is look at what Judge Alsop said in terms of talking about Hughes's thing. This transaction with SEO was a straightforward, legal, valid transaction. The bank knew that Teng Trong Saktai was a nominee. The bank knew that Dejanoo was a true owner. The bank knew that SEO Corporation was formed so that the bank could have some collateral for the loan. The bank knew that Peter Dejanoo was a true owner. For what happened four days later was a total normal commercial transaction for Prasit Teng, I'm getting excited about it. Prasit Teng Trong Saktai to transfer 90% ownership to Peter Dejanoo. That's exactly what everybody intended to happen, because Dejanoo was a true owner and the bank knew it. There's no suspicion around those activities on August 18th and August 19th. What evidence counsel did your client produce to counter the judge's notion of willful blindness? You know, the issue of willful blindness, first of all, was never litigated in this matter in the court below. But the concept of willful blindness, which I'm familiar with, and I think you are too, Your Honor, because of your involvement as a U.S. attorney regarding these issues, is something where you have to have a willful blindness to a fact that can be commonly known by that person. He was the Secretary of the Treasury. An owner of a building where drug dealing was going on, and the owner apparently travels to that building and sees the activity around that building. That's a willful blindness, you know. I don't think the concept of willful blindness applies here. It's impossible for him to have known something like that. And there's no evidence that he was even involved in that. Just because he was an attorney doing certain things for certain people doesn't mean he knew about that. Well, it's not a willful blindness element. It's a one piece of paper that was a loan application, and like you said, Your Honor, you know, it probably was totally irrelevant to the loan itself, where the bank made about $4 million profit. Yes, I have a follow-up, yes. With respect to this counsel, the judge, the district judge found that this activity was certainly suspicious. Here your client is the CFO, the Treasurer, the Secretary, the attorney for Desjardins on other matters prior to this transaction. After, Your Honor, excuse me. Well, after, with respect to CEO? SEO. SEO, excuse me. All right. But certainly as an officer of SEO, he's an insider of sorts. He's involved in all the meetings. The meetings are occurring at his law office with the principals here, with all these transactions. I see your point. Could a reasonable finder of fact find that he was putting his head in the sand? Well, what evidence is there to the contrary? I can't see that, Your Honor. First of all, too, SEO has nothing to do with the loan application. Tang-Tran Sac-Dai submitted a loan application not on the as an officer of SEO, but personally. It was a personal loan application. As a matter of fact, it wasn't even a real estate purchase loan application. It was a commercial loan application personally by him. SEO was formed. Mr. Kissinger wasn't involved in SEO until after the sale was completed, when they had the meeting four days later, and that's when he was named a he was involved with SEO. Before that, he wasn't an officer of SEO. So there wasn't some head in the sand. And did your client tell the district court by deposition or otherwise under oath that after the transaction on the 14th that he did not know that there was a fraudulent loan application? If he was asked that question, that's what he would have answered. But I don't know that he was ever asked that question or that question came up. If he had the burden of proof, would it have been incumbent upon him to make that point to the district court? I don't see that he has a burden of proof on that point, and I don't know that it would be incumbent upon him to come forward with a negative when all the evidence in the case clearly shows that he was not involved in the loan application, not involved at all. And there's a tremendous amount of evidence in this case in terms of trial testimony, in terms of the hearing afterwards that establishes that he wasn't involved, didn't know about it, wasn't a party to it at all. So I can't see the wolf of blindness. All right. Thank you, Your Honor. Thank you, counsel. The case of United States v. Kissinger is submitted, and we will recess until tomorrow morning. Thank you.
judges: B. Fletcher, Berzon, Houston